UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 09-20673-CR-GRAHAM/TORRES

UNITED STATES OF AMERICA,

    Plaintiff,

v.

JOSE CONRAD SAMS,

    Defendant.
_____/

REPORT AND RECOMMENDATION ON
DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

This matter is before the Court on Defendant Jose Conrad Sams' ("Defendant") Motion to Suppress Evidence Derived from Unlawful Vehicle Stop and Seizure. [D.E. 564].[1] The government filed a response in opposition to the motion. [D.E. 622]. An evidentiary hearing was held on March 19, 2010. Having carefully considered the motion and opposition thereto, the testimony of the four government witnesses, the evidence admitted into evidence at the hearing, the arguments of counsel, and being fully advised in the premises, we recommend that Defendant's motion to suppress be DENIED for the reasons forth below.

---

[1] This matter was referred to the undersigned Magistrate Judge by the Honorable Donald L. Graham for a Report and Recommendation, pursuant to 28 U.S.C. § 636 and the Magistrate Judge Rules for the Southern District of Florida. [D.E. 579].

## I. FACTUAL FINDINGS

Defendant was indicted for conspiracy to posses with the intent to distribute cocaine (Count 16) and possession with the intent to distribute cocaine (Count 17), in violation of 21 U.S.C. §§ 846 and 841(a)(1), respectively. [D.E. 209 at 10-11]. The following facts, taken from testimony adduced at the hearing, describe the events that led to his indictment.

### A. *Background*

U.S. Drug and Enforcement ("DEA") Agent Nicholas Vattiato was one of the lead agents in the investigation that culminated in the arrest of the Defendants in this case. The investigation began about one and one-half (1 ½) to two (2) years ago, when DEA began investigating drug sales in Coconut Grove. During the investigation, agents used various methods to gather information, including working with confidential informants ("CIs"), surveillance, and obtaining wiretap authorizations for some of the Defendants' phones. However, on January 13, 2009, the date that is relevant to Defendant Sams' motion to suppress, no wiretap had yet been authorized.

On January 13, 2009, Agent Vattiato received information from a reliable CI[2] that one of the co-Defendants in this case, Jeffrey Watson, was waiting to accept delivery of one to one and one-half (1-1½) kilos of cocaine later that day from a person known as "J.R." who would be driving a black Dodge Charger from the Orlando area.

---

[2] The CI had on at least two previous occasions provided accurate information regarding drug transactions, including one transaction that involved Watson.

Based on this information, at approximately 1:30 p.m., agents established surveillance on Watson whom they located at his mother's house in Coconut Grove.

Later that afternoon, agents observed a Nissan Titan pickup truck arrive at Watson's mother's house. The vehicle was registered to "Freddie Davis" from the Orlando area. Watson got into the car and he and the other two men in the vehicle departed. Watson drove; a man later identified as co-Defendant Freddie Davis was the front passenger; and Defendant Sams sat in the back seat.

Agents followed the vehicle to a shopping mall and waited there while the men walked about the mall. After about two hours, Agent Vattiato directed the CI to call Watson and ask whether the meeting was still on. A few moments later, Watson called the CI back to advise that the delay was caused by the cocaine not being packaged properly and that he was awaiting a call from J.R.

Shortly thereafter, the three men returned to the Nissan and drove to an apartment complex in Kendall. DEA Special Agent Christopher Witley, one of the agents who had been surveilling the Nissan from the time it first arrived at Watson's mother's house in Coconut Grove, followed the vehicle into the apartment complex in Kendall. The driver drove to the rear of the complex, then backed into a parking space and parked. Shortly thereafter, a black Charger arrived and backed into the space along the passenger side of the Nissan. The Charger was owned by co-Defendant Nathaniel Thomas, Jr., known as "J.R."

Special Agent Witley parked approximately fifty (50) yards away. Although it was after 6 p.m. and dark outside, the parking lot was lit by street lamps and the

agent had an unobstructed view of the front of the cars. Aided by binoculars, he observed Watson exit the Nissan, walk in front of the two vehicles, and get into the front passenger seat of the Charger. He saw (through the windshield) Watson and the driver of the Charger communicate and engage in what the agent described as a "hand-to-hand" transaction. Within a few minutes, Watson exited the Charger carrying a white plastic shopping bag that was weighted down with something inside. Watson entered the Nissan, spoke with the person in the front passenger seat, and Special Agent Witley saw another hand-to-hand transaction take place. Watson then exited his vehicle again, without the white plastic bag, and walked over to and entered the Charger. Special Agent Witley witnessed more communication and another hand-to-hand transaction between Watson and the driver of the Charger. Watson then exited the Charger, got into the Nissan, and departed.

Special Agent Witley described what he was observing to officers over the police radio as he observed it. Agent Vattiato, a co-lead agent in this investigation, did not witness the suspected drug transaction but heard a fellow officer report that he had seen Watson carry a white plastic bag that appeared to be "weighted" back to the Nissan. Based on the information provided, Agent Vattiato believed a drug transaction had occurred and he directed other agents to maintain physical surveillance on the Nissan. The vehicle traveled back to Watson's mother's house in Coconut Grove. Watson exited the car, but Agent Vattiato did not observe him carrying anything when he left the car. The Nissan then drove to the Florida Turnpike and headed north. The

vehicle stopped at a gas station on the Turnpike but the occupants did not meet with anyone.

DEA Special Agent Christopher Boardman, who was staged with City of Sunrise police officers in Broward County, was in communication with the agents who were surveilling the Nissan in the course of the narcotics investigation. He heard case agents say via the police radio that the vehicle was proceeding northbound on the Turnpike and that the vehicle should be stopped when it crossed into Broward County.

Officer Kevin Sweat, a trained canine handler with the Sunrise Police Department, actually effected the stop of the Nissan. He was notified that other officers were following two black males in a dark-colored Nissan Titan pickup truck whom they had probable cause to believe were involved in a drug transaction. Officer Sweat, who was driving a marked police vehicle, was asked to stop the vehicle which was traveling northbound on the Turnpike. He positioned himself just off the highway and monitored via police radio the progress of the vehicles heading north. When the Nissan passed, he got on the Turnpike and pulled the Nissan over. He approached the passenger side of the car and asked the passenger to exit the vehicle. DEA agents who had been following the vehicle went to the driver's side and asked the driver to exit the vehicle.

When everyone had stepped away from the Nissan, Officer Sweat brought his canine partner, Rocky, to the Nissan. Rocky has been certified in narcotics detection. Rocky circled the Nissan once and, within about thirty (30) seconds, alerted to the passenger's side door. Officer Sweat opened that door, and Rocky jumped into the car

and immediately alerted to a clear plastic bag on the floorboard underneath the seat of the passenger's seat. Special Agent Boardman, who was on the scene immediately after the stop occurred, recovered the bag which contained a kilogram of cocaine. From the time the Nissan was spotted in Sunrise until the time the drugs were discovered inside the vehicle, no more than ten (10) minutes elapsed.

Neither Sams nor Davis were arrested at that time. They were taken to the Sunrise Police Department where they spent approximately twenty (20) to thirty (30) minutes before being released. The entire incident – from the time the stop was initiated to the time these co-Defendants were released – lasted no more than one (1) hour.

### B.   *Motion to Suppress*

Defendant moves to suppress the evidence seized from the Nissan Titan in which he was a passenger. He asserts that officers had neither reasonable suspicion nor probable cause to stop the vehicle. He also contends that the length of the detention was excessive under the circumstances. For these reasons, Defendant contends his Fourth Amendment rights were violated and the evidence seized during the search of the Nissan should be suppressed.

## II.   ANALYSIS

### A.   *Vehicle Stop Based on Probable Cause*

It is well-established that police are permitted to stop and search an automobile without a search warrant if they have probable cause to believe that the vehicle contains contraband and that exigent circumstances necessitate a search. *United States v. Forker*, 928 F.2d 365, 368 (11th Cir. 1991) (citing *United States v. Alexander*,

835 F.2d 1406, 1409 (11th Cir. 1988)). "Probable cause to search exists 'when the facts and circumstances would lead a reasonably prudent [person] to believe that the vehicle contains contraband.'" *Id.* (citation omitted). Exigent circumstances exist when the inevitable delay incident to obtaining a search warrant must give way to a need for immediate action. *Id.* If there is a possibility that contraband will be destroyed or removed, the exigency of the circumstances justify a warrantless search. *Id.* "The ability of the vehicle to become mobile is sufficient to satisfy the exigency requirement." *Id.* (citing *Alexander*, 835 F.2d at 1409); *see also United States v. Nixon*, 918 F.2d 895, 903 (11th Cir. 1990) ("the requirement of exigent circumstances is satisfied by the 'ready mobility' *inherent* in all automobiles that reasonably appear to be capable of functioning.") (emphasis in original).

A determination of probable cause is based on an evaluation of the totality of the circumstances. *Illinois v. Gates*, 462 U.S. 213, 230-31 (1983) (the probable cause standard is a "practical, nontechnical conception."). In deciding whether probable cause exists, this Court may examine the collective knowledge of law enforcement officials "if they maintained at least a minimal level of communication during their investigation." *United States v. Willis*, 759 F.2d 1486, 1494 (11th Cir. 1985) (citing *United States v. Else*, 743 F.2d 1465, 1476 (11th Cir. 1984) ("where a group of officers is conducting an operation among them and there is at least minimal communication among them, we look to the collective knowledge of the officers in determining probable cause.")); *see also United States v. Kapperman*, 764 F.2d 786, 791 n.5 (11th Cir. 1985) (deputy sheriff entitled to act on the strength of a radio communication directing him

to stop a vehicle and secure the scene); *United States v. Olmedo*, 552 F. Supp. 2d 1347, 1356 (S.D. Fla. 2008).

We find based on the totality of the circumstances that officers had probable cause to stop the Nissan Titan. Earlier that day, the agent who was co-leading this narcotics investigation received information from a reliable informant that Jeffrey Watson would be receiving 1-1½ kilos of cocaine later that day from "J.R." who would be driving a black Dodge Charger from the Orlando area. Agents established surveillance on Watson and were able to corroborate the facts related by the CI before the Nissan was stopped.

Watson was picked up by Freddie Davis in a Nissan Titan from the Orlando area. A subsequent telephone call between the CI and Watson confirmed that Watson was still awaiting delivery of the cocaine from J.R. Later, Watson met with J.R. who was driving a black Charger. Watson and J.R. appeared to engage in "hand-to-hand" transactions. Watson received a package from J.R. that he took back to the Nissan. When Watson left the Nissan, he did not appear to take the package with him. The other men in the Nissan proceeded to leave Miami and head north on the Turnpike, at which point they were pulled over. The officers remained in contact with one another, relating events as they observed them. Based on these facts, we find the officers had probable cause to believe there were narcotics inside the Nissan and to stop and search the vehicle. *See, e.g., United States v. Allen*, No. 08-16417, 2009 WL 3929595, at *2 (11th Cir. Nov. 20, 2009) (officers had probable cause to believe that the defendant's vehicle contained cocaine base he intended to sell to the CI, based on the

CI's earlier telephone conversation with the defendant in which the defendant agreed to sell the CI cocaine base at a particular gas station on a specific road, and the defendant's subsequent appearance at that gas station); *United States v. Talley*, 108 F.3d 277, 281 (11th Cir. 1997) (information provided by a confidential informant combined with the independent corroboration of the police gave rise to a probable cause belief that the defendant's vehicle contained contraband); *Olmedo*, 552 F. Supp. 2d at 1355-56 (agent supervising narcotics investigation had probable cause to believe the defendant's vehicle contained narcotics based on the content of two intercepted phone calls regarding the exchange of money for cocaine, the observations of various officers who described the defendant's actions over police radio, including his meeting with the person whom he was supposed to meet and swapping bags with that person, the discovery of a large amount of U.S. currency in the other person's car, and the content of a third intercepted call from the defendant confirming he had the drugs; the "collective knowledge" doctrine applied so that the knowledge of officers with probable cause was imputed to the officer who actually stopped and searched the defendant's vehicle).

### B.     *Vehicle Stop Based on Reasonable Suspicion*

Even if the officers did not have probable cause to stop the vehicle, they certainly had reasonable suspicion to do so. Reasonable suspicion, which exists when an officer has a reasonable and articulable suspicion that criminal activity is afoot, is sufficient to justify a brief investigatory stop even in the absence of probable cause. *See generally Alabama v. White*, 496 U.S. 325, 330 (1990) ("Reasonable suspicion is a

less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause."; finding that anonymous informant's tip that the defendant would leave a particular apartment at a particular time in a particular vehicle and go to a particular motel, and would be in possession of cocaine, as independently corroborated by police, was sufficiently reliable to supply reasonable suspicion that the defendant was engaged in criminal activity and thus investigative stop of vehicle did not violate Fourth Amendment).

It is well-settled that this rule applies to investigatory stops of automobiles as well as persons on foot. *See, e.g., United States v. Sharpe*, 470 U.S. 675, 682 (1985); *Kapperman*, 764 F.2d at 791. We engage in a dual inquiry when evaluating the reasonableness of an investigative stop: we examine the reasonableness of the stop at its inception, and whether the continued detention was reasonably related in scope to the circumstances that justified the stop in the first place. *Sharpe*, 470 U.S. at 682. Part of our inquiry focuses on whether officers "diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *Id.* at 686.

The same facts described above – the tip from a reliable informant and the officers' corroboration of the predictive details of the informant's tip – gave them reasonable suspicion to believe that there were drugs inside the Nissan Titan. *See,*

*e.g., United States v. Baggin*, No. 09-11502, 2009 WL 4042691, at *2 (11th Cir. Nov. 23, 2009) (reasonable suspicion to stop the defendant's vehicle existed, where the confidential informant had previously provided reliable information to officers; the officer was present for the phone call between the informant and the defendant to set up the controlled buy and the officer recognized the defendant's voice; and the defendant was stopped en route to the location of the drug deal)*; United States v. Glinton*, 347 Fed.Appx. 453, at *2 (11th Cir. 2009) (officers's collective knowledge supported a reasonable suspicion that the defendant was engaged in drug trafficking, where their surveillance corroborated a tip from a reliable informant, and the officers saw the defendant act consistently with the informant's information, thus the stop of the defendant's vehicle to confirm or dispel reasonable suspicion was permissible); *United States v. Rodriguez*, 312 Fed.Appx. 205, at *4 (11th Cir. 2009) (officers had reasonable suspicion of criminal activity, based on informant's knowledge and reliability during the course of setting up a drug transaction with the defendant, to stop defendant's vehicle to ascertain whether it contained contraband).  The officers thus were entitled to stop the vehicle and order the occupants out of the car for questioning, to confirm or dispel their suspicions. Officer Sweat effected the stop, and literally within minutes, Rocky the canine dog alerted to the presence of narcotics inside the vehicle. At that point, based on the information available to them and the canine alert, officers had probable cause to believe that the Nissan contained narcotics. *See United States v. Tamari*, 454 F.3d 1259, 1265 (11th Cir. 2006) (probable cause arises when a drug-trained canine alerts to drugs).  They thus were justified in

conducting the warrantless search of the vehicle that produced the package containing a kilo of cocaine.

The entire incident, from the time the Nissan was spotted to the time the drugs were discovered, took no more than 10 minutes. Defendant and his co-Defendant were released from custody within an hour. The detention was not in any way excessively long. For the foregoing reasons, we recommend that Defendant's motion to suppress this evidence be denied.

### III.   CONCLUSION

Based on the foregoing, the undersigned Magistrate Judge does hereby **RECOMMEND** that:

1. Defendant Leon Anthony Frederick's Motion to Suppress Wiretap and Other Evidence [D.E. 539] be **DENIED**.

2. Defendant Leon Anthony Frederick's Second Motion to Suppress Physical Evidence [D.E. 573] be **DENIED**.

Pursuant to Local Magistrate Rule 4(b), the parties have ten (10) days to serve and file written objections, if any, with the Honorable Donald L. Graham, United States District Judge. Failure to timely file objections shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the report and bar the parties from attacking on appeal the factual findings contained herein. *R.T.C. v. Hallmark Builders, Inc.,* 996 F.2d 1144, 1149 (11th Cir. 1993); *LoConte v. Dugger*, 847

F.2d 745 (11th Cir. 1988); *Nettles v. Wainwright*, 677 F.2d 404, 410 (5th Cir. Unit B 1982) (en banc); 28 U.S.C. § 636(b)(1).

**DONE AND SUBMITTED** in Chambers at Miami, Florida, this 29th day of March, 2010.

/s/   *Edwin G. Torres*
EDWIN G. TORRES
United States Magistrate Judge